## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| XCALIBER INTERNATIONAL LIMITED, LLC, and KT&G CORP., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 04-CV-0922-CVE-PJC |
| W.A. DREW EDMONDSON, in his official capacity as Attorney General, State of Oklahoma, | ) ) ) ) ) | |
| Defendant. | ) | |

### OPINION AND ORDER

Now before the Court are the original and amended motions for reconsideration (Dkt. ## 155, 157)[1] filed by plaintiffs Xcaliber International Limited, LLC ("Xcaliber") and KT&G Corp. ("KT&G"). Pursuant to Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure, plaintiffs ask the Court to reconsider its Order of May 20, 2005 (Dkt. # 152) granting summary judgment in favor of defendant as to plaintiffs' Sherman Act claims.

### I.

Plaintiffs Xcaliber and KT&G each manufacture tobacco products that are distributed in Oklahoma. They have challenged an amendment to Oklahoma's legislation implementing the Master Settlement Agreement ("MSA"), the Allocable Share Amendment, which would mean significantly smaller releases of the escrow payments they are required to make as non-participating manufacturers ("NPMs") than they would have received under the original legislation. Xcaliber and

---

[1]     The only apparent difference between plaintiffs' original and amended motions is the alteration of some language in the first paragraph purporting to recite a portion of the briefing history of defendant's motion for summary judgment, filed on March 21, 2005. See Part IV, infra.

KT&G filed suit against the Attorney General on December 10, 2004, challenging the amended statute on antitrust grounds, alleging that it creates a price-fixing scheme and an output cartel among participating manufacturers ("PMs"), which is illegal per se under section 1 of the Sherman Act (15 U.S.C. § 1), and which has caused irreparable damage to their business and property.  They sought a judgment declaring the amended statute to be unconstitutional on its face and as applied to them on several grounds.  Defendant filed a motion to dismiss as to all claims on January 18, 2005 (Dkt. # 29), and a motion for summary judgment as to the Sherman Act claims on March 21, 2005 (Dkt. ## 79 and 124).  The Court dismissed plaintiffs' First Amendment, Equal Protection, Due Process, and Commerce Clause claims on April 5, 2005, see Order (Dkt. # 103), and granted defendant's motion for summary judgment on May 20, 2005, see Order (Dkt. # 152). The procedural history of this case is outlined in more detail in Part IV, infra.

Plaintiffs now challenge the Order on summary judgment, alleging that (1) the Court's hybrid restraint analysis conflicts with Supreme Court antitrust and preemption jurisprudence, the rulings of the Second and Third Courts of Appeals, and the ruling of at least one other district court addressing the merits of a similarly challenged Allocable Share Amendment; (2) the Court did not consider the factual record "in the light most favorable to the parties opposing summary judgment"; and (3) that "newly discovered evidence . . . further creates genuine issues for trial."  Plaintiffs' Amended Motion (Dkt. # 157) at 2.  They ask the Court to reconsider the Order in the light of this newly submitted evidence pursuant to Fed. Rs. Civ. P. 59(e) and 60(b).

## II.

Plaintiffs assert that the Court did not consider the factual record "in the light most favorable to the parties opposing summary judgment."  Preliminarily, the Court observes that plaintiffs' briefs

in support of their motions for reconsideration are rife with mischaracterizations, misrepresentations, and bald misstatements of the Court's Order (as well as of defendant's response brief).  Most egregiously, and completely unaccountably, plaintiffs assert in their reply brief that the Court found "that the Allocable Share Amendment enforces and implements a 'hybrid' restraint of trade that is subject to scrutiny under the Sherman Act."[2]  Plaintiffs' Reply (Dkt. # 163) at 2-3.  In fact, the Court ruled that "[t]he Allocable Share Amendment  cannot be said to create or constitute either a private or a hybrid restraint . . . [and] is therefore protected from antitrust scrutiny by the state action doctrine."  Order (Dkt. # 152) at 11.[3]

Plaintiffs conclude, on the basis of this wildly inaccurate characterization of the Court's findings, that the "remaining issue is whether the Court overlooked facts that demonstrated at least a material issue as to whether the Allocable Share Amendment in combination with the MSA is anticompetitive, i.e. whether they [sic] unreasonably restrain trade."  Plaintiffs' Reply (Dkt. # 163) at 3.  However, as the Court has already explained, "the Sherman Act does not prohibit state governments from directly imposing restraints on competition in the exercise of their police and regulatory powers."  Order (Dkt. # 152) at 9.  Accordingly, to prevail on a Sherman Act claim, "a plaintiff must show that it is injured by a hybrid restraint, which is defined as government action delegating regulatory power to private parties so that they can enforce their own private market decisions."  Id.  As stated above, and explained further below, the Court found no hybrid restraint.

---

[2]     Confusingly, the Court's finding was properly stated in plaintiffs' earlier filed amended motion for reconsideration (Dkt. # 157) at 2.

[3]     Plaintiffs equally unaccountably allege that the Court "observed [that] the Escrow Statute enforces and implements the MSA."  Plaintiffs' Reply (Dkt. # 163) at 2.  However, as the Court explained in footnote 5 of the order on summary judgment, the Court has found no such thing.

Plaintiffs also allege the summary judgment motion is improperly decided, arguing that this is borne out by the fact that defendant "states unequivocally that he did not base his summary judgment motion on the facts this Court relied upon in deciding the motion . . . [and] suggests that the Court improperly considered the 'effects' of the Allocable Share Amendment." Plaintiffs' Reply (Dkt. # 163) at 1-2.  What defendant actually wrote, defending the allegation that the Court overlooked much of plaintiffs' record evidence, was that plaintiffs offered evidence "in support of erroneous legal theories" and that "[p]reemption . . . involves state laws or regulations that require or authorize private parties to engage in per se violations of the Sherman Act . . . [but that s]tate laws or regulations that have anti-competitive effects do not result in preemption." Defendant's Response (Dkt. # 161) at 10-11.  The Court based its analysis on the rule that because the Sherman Act does not prohibit state governments from directly imposing restraints on competition, a plaintiff must show a government action delegating regulatory power to private parties enabling them to enforce their own private market decisions.  This rule is merely a more nuanced statement of that recited by defendant and it does have the effect of making much of plaintiffs' proffered evidence concerning anticompetitive effects irrelevant to the analysis.

Plaintiffs further complain that the Court based its hybrid restraint analysis "principally on marginal cost theories," taking issue with the Court's citation to the summary judgment record.[4] However, the Court's conclusion does not in any way rely on how individual PMs make their pricing decisions or on what those decisions are, but on the facts that all cigarette manufacturers, even under the cost constraints imposed by the MSA and the Allocable Share Amendment, have choices as to

---

[4]     Although plaintiffs cite it frequently in their briefs on these motions, neither party has ever made the deposition of defendant's expert Jonathan Gruber a part of the summary judgment record.

price and output, and that they make their decisions as to these issues unilaterally – not by agreement or in collusion with any other manufacturer, or in any way to avoid an increase in market share.[5]

The Court initially refused to dismiss plaintiffs' Sherman Act claims because plaintiffs had alleged that the Allocable Share Amendment, within the context of the MSA, effectively created an output cartel by creating and enforcing penalties for any PM which exceeded the market share it held when it signed the MSA, thereby compelling PMs to match any other PM's price increase to avoid increased market share.  The summary judgment record contained no evidence supporting this allegation, instead providing ample evidence that SPMs frequently produce above their original market shares.  Further, plaintiffs have failed to demonstrate how such an output cartel, if it were actually proven, would give PMs regulatory control over price setting by NPMs.  The amount NPMs must pay into escrow is set by statute, and although the effective cap relies upon the MSA (and so tangentially upon the market shares maintained by the NPMs' competitors), the Allocable Share Amendment gives PMs no regulatory authority over the prices NPMs choose to set.  Accordingly,

---

[5]      Whether, as plaintiffs insist, exempt SPMs do not make price and output decisions based on the ratio of their marginal costs to their marginal revenues, but instead according to some price averaging system which allows them to take advantage of their grandfathered share, is irrelevant to the question of whether the MSA imposes such stiff penalties for increased market share that every participating manufacturer feels the need to match the prices of every other in order to avoid any gain.  As even plaintiffs have pointed out in their briefing on these motions, several exempt SPMs now consistently choose to increase market share rather than to raise prices in the face of rising NPM prices.  Plaintiffs' Amended Motion (Dkt. # 157) at 6-7. This clearly demonstrates that the grandfathered share system does not act as an output limitation agreement.

Incidentally, Judge Hellerstein, in his Order denying a request for preliminary injunction against the MSA and Escrow and Contraband statutes, also confidently cites expert opinions that cigarette manufacturers set prices based on marginal costs.  Freedom Holdings, Inc. v. Spitzer, No. 02 Civ. 2939, 2004 WL 2035334 at 23, 24 (S.D.N.Y Sept. 14, 2004) (unpublished).

the Court granted summary judgment in favor of defendant.  Plaintiffs' arguments that the Court failed to consider the evidence in the light most favorable to them provide no basis for reconsideration.

### III.

Plaintiffs also assert that "the Court's hybrid-restraint analysis conflicts with Supreme Court antitrust and preemption jurisprudence, the rulings of the Second and Third Circuit Courts of Appeals, and the ruling of at least one other District Court addressing the merits" of a similarly challenged Allocable Share Amendment.  Plaintiffs' Amended Motion (Dkt. # 157) at 2.

The Supreme Court has held that "when a state legislature adopts legislation, its actions constitute those of the State, and ipso facto are exempt from the operation of the antitrust laws." Hoover v. Ronwin, 466 U.S 558, 567-68 (1984).  However, a challenged state statute may be preempted if it authorizes private parties to violate the Sherman Act.  City of Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 379 (1991); Parker v. Brown, 317 U.S. 341, 351 (1943). Accordingly, the Court searched the summary judgment record for any evidence that the Allocable Share Amendment, in the context of the MSA, authorized PMs to combine or conspire to set prices or output in the cigarette market.  There is no evidence that the challenged statute either positively or negatively affects PMs' ability to do that.  All it does, by allegedly forcing NPMs to raise their prices, is lessen the competitive threat NPMs pose.  Still, the additional costs NPMs must cover under the Allocable Share Agreement are set by the legislature and are less than the costs imposed upon either OPMs or non-grandfathered SPMs under the MSA.  The imposition of those costs constitutes unilateral state action.  No private party is authorized or permitted thereby, even within the context of the MSA, to enforce output or price decisions.  Thus, there is no hybrid restraint.

Plaintiffs cite <u>Schwegmann Bros. v. Calvert Distillers Corp.</u>, 341 U.S. 384 (1951), in support of their contention that the Court's Order overlooks applicable Supreme Court precedent. However, in <u>Schwegmann</u>, plaintiffs challenged a trade practice, deemed legal under state law, by which a retailer could be enjoined from knowingly underselling another retailer whose prices were set under a resale price maintenance contract with a supplier (and not by the state itself). In this case, there is no such forced minimum pricing and the higher costs are set directly by the state legislature. <u>Schwegmann</u> is inapplicable. The rest of the Supreme Court cases cited and discussed by plaintiffs were reviewed and, when relevant, discussed by the Court in its previous order.[6]

Plaintiffs next assert that the Order conflicts with the rulings of the Second Circuit in <u>Freedom Holdings v. Spitzer</u>, 357 F.3d 205, <u>reh'g denied</u>, 363 F.3d 149 (2d Cir. 2004), and the Third Circuit in <u>A.D. Bedell Wholesale Co. v. Philip Morris, Inc.</u>, 263 F.3d 239 (3d Cir. 2001), both of which were rulings on motions to dismiss in which the respective courts accepted as true the

---

[6]     First, several of these cases involve no state action. <u>California Dental Ass'n v. FTC</u>, 526 U.S. 756 (1999) (addressing appropriate approach to professional association of dentists' restrictions on advertising; no state action); <u>Catalano, Inc. v. Target Sales, Inc.</u>, 446 U.S. 643, 648 (1980) (agreement among private beer wholesalers to fix credit terms under which they would deal with retailers deemed illegal <u>per se</u>; no state involvement); <u>Nat'l Soc'y of Prof'l Eng'rs v. United States</u>, 435 U.S. 679, 692 (1978) (civil antitrust action against professional association for agreement stifling competition; no state action involved); <u>United States v. Container Corp. of Am.</u>, 393 U.S. 333, 337 (1969) (civil antitrust action against pricing sharing arrangement among dominant sellers of product with inelastic market; no state action involved); <u>United States v. Socony-Vacuum Oil Co.</u>, 310 U.S. 150 (1940) (criminal prosecution of private parties accused of conspiring to raise gasoline prices, no state action involved). Second, although these precedents certainly support the proposition that any agreement among competitors that directly affects their pricing decisions is prohibited by the Sherman Act (<u>e.g.</u>, <u>324 Liquor Corp. v. Duffy</u>, 479 U.S. 335, 342 (1987) (resale price maintenance statute – directly setting resale price (112% of wholesale) while requiring wholesalers to set and post their prices – is <u>per se</u> violation of Sherman Act)), the Court has found no such agreement setting prices or output embodied by the Allocable Share Amendment, even within the context of the MSA. Further, the state action at issue here imposes costs; it does not set prices.

allegations in the complaints.  The Court thoroughly considered, cited to, and discussed these decisions in its orders on both the motion to dismiss and the motion for summary judgment. Plaintiffs argue that the courts in these two cases "held that the regulatory scheme and restraints established under the MSA and Escrow Statutes are subject to preemption under the Sherman Act, because they enforce, support and sanction private anticompetitive conduct."  However, what the courts actually held was that the allegations of the complaint were sufficient to support a Sherman Act claim, not that any Sherman Act violation had actually been proved.  See Freedom Holdings, 357 F.3d at 232 ("That leads us to conclude that the Contraband Statutes, were the allegations of the complaint proven, would not be saved by the Parker state action immunity."); A.D. Bedell, 263 F.3d at 249-50 ("We hold that plaintiffs have properly pleaded an antitrust violation by alleging defendants agreed to form an output cartel through the Multistate Settlement Agreement that violates § 1 and § 2 of the Sherman Antitrust Act.").  Plaintiffs apparently continue to misunderstand the significance of a court's finding that a plaintiff's allegation is sufficient to withstand a motion to dismiss.[7]  It does not mean the Court has found that allegation to have been proved.  See Order (Dkt. # 152) at 9 n.5 (explaining this distinction).

Plaintiffs further cite the decision of the district court in Freedom Holdings upon remand from the Second Circuit.  Freedom Holdings, Inc. v. Sptizer, No. 02 Civ. 2939, 2004 WL 2035334 at 23, 24 (S.D.N.Y Sept. 14, 2004) (unpublished).  There, the court denied the motion for preliminary injunction as to the Sherman Act claims based upon the MSA itself and the escrow and

---

[7]   Plaintiffs assert that this Court "granted Defendant's motion, dismissing Plaintiffs' antitrust claims . . . ."  Plaintiffs' Amended Motion (Dkt. # 157) at 2.  Although the Court did grant defendant's motion to dismiss all of plaintiffs' other claims, it denied defendant's motion to dismiss plaintiff's antitrust claims.  Later, the Court granted summary judgment in defendant's favor as to those claims.

contraband statutes, finding that plaintiffs had failed to demonstrate the probability of success on the merits or irreparable injury.  Id. at *31.  It did issue a preliminary injunction as to the enforcement of New York's Allocable Share Amendment.  Id.  The Allocable Share Amendment in that case, which had only recently gone into effect, had not been initially challenged by plaintiffs, and was raised only much later in the proceedings.  Time has passed and the facts before this Court are different.  Judge Hellerstein of the Southern District of New York denied plaintiffs' motion with respect to the MSA and escrow and contraband statutes on the grounds that they merely prevented "NPMs from free-riding on the payments required of OPMs and SPMs, by requiring NPMs to set aside proportionately equivalent funds to assure the states compensation will be available to them for injuries to the public that the NPMs are causing and will continue to cause by selling and distributing cigarettes within the settling states."  Id. at *28.  Here, it is the Allocable Share Amendment, by closing the loophole that allowed NPMs not to set aside proportionately equivalent sums by concentrating their sales in states with smaller allocable shares, that can be said to accomplish this.  Furthermore, to reiterate, the Allocable Share Amendment constitutes unilateral state action, neither requiring nor authorizing any behavior, anticompetitive or otherwise, from PMs in order to have its full effect.

For all these reasons, the Court finds that plaintiffs' assertions regarding the overlooking of applicable precedents have no merit and provide no basis for reconsideration.

## IV.

Finally, plaintiffs argue that they were "railroaded by a premature motion for summary judgment that failed to provide [them] with sufficient time to obtain and marshal the evidence needed to submit a complete response . . .," and so they should be permitted to present new evidence

under Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure.  "The purpose [of a Rule 59

(e) motion] is to correct manifest errors of law or to present newly discovered evidence."

Committee for the First Amendment v. Campbell, 962 F.2d 1517, 1523 (10th Cir. 1992).  Rule 59(e)

is "not a license to reargue the merits or present new evidence."  Royal Ins. Co. of Am. v. Miles &

Stockbridge, P.C., 142 F. Supp. 2d 676, 677 n.1 (D. Md. 2001) (citing RGI, Inc. v. Unified Indus.,

Inc., 963 F.2d 658 (4th Cir. 1992)).  Further, "[r]elief under Rule 60(b) is extraordinary and may

only be granted under exceptional circumstances."  Bud Brooks Trucking, Inc. v. Bill Hodges

Trucking Co., 909 F.2d 1437, 1440 (10th Cir. 1990).

Contrary to plaintiffs' claims, the expedited scheduling in this case was specifically

requested and agreed to by both parties.  Defendant filed a motion to dismiss as to all claims on

January 18, 2005 (Dkt. # 29).  At a hearing on an earlier filed motion for preliminary injunction held

on January 24, 2005, the parties agreed to an agreed preliminary injunction as long as the Court

would also grant an expedited discovery and trial schedule pursuant to which the Court agreed to

rule on the merits by April 30, 2005.  The parties stipulated as follows:

> MR. KEEGAN (counsel for plaintiffs): Briefing will be completed according to the
> local rules on the State's motion to dismiss, and it will be submitted for decision by
> the Court.  Pending a decision on the merits by the district court, the quarterly
> payment regulations and the amendment to the escrow statute will not be enforced
> against the plaintiffs.  If the plaintiffs lose on the merits, they will owe the accrued
> escrow obligations under the amendment retroactive to January 1st, 2005, and will
> be required to pay those obligations as follows: For obligations accruing in the first
> quarter of 2005, payment is due within 12 months of the ruling on the merits.  For
> obligations accruing thereafter, plaintiff shall be allowed four additional months to
> make payment for each month or portion thereof for which a payment obligation has
> accrued up until the ruling on the merits.
> . . .
> THE COURT: Very well. We are going to set this matter for expedited nonjury trial.
> . . I believe we've agreed on April 11th and 12th.

Transcript of Proceedings, Hearing on Motion for Preliminary Injunction, January 24, 2005, p. 39, ll. 13-25, p. 40, ll. 1-7 and 18-19.  At that time, the parties also agreed to a discovery cut-off of March 15, 2005 (this was later extended by agreement of both parties to March 25, 2005).  Four days before the extended discovery cut-off date, on March 21, 2005, defendant filed a motion for summary judgment as to the Sherman Act claims (Dkt. ## 79 and 124 (amended)).  On April 5, 2005, the Court dismissed plaintiffs' First Amendment, Equal Protection, Due Process, and Commerce Clause claims.  See Order (Dkt. # 103).  Only plaintiffs' Sherman Act claims remained.

Shortly after filing his motion for summary judgment, defendant filed a motion for expedited briefing (Dkt. # 80).  The Court denied the motion, taking the motion for summary judgment under advisement.  In their original motion to reconsider (Dkt. # 155), plaintiffs first asserted that, after indicating that briefing on the motion would be stayed pending trial, the Court "recanted," requesting that plaintiffs file their response by April 7, 2005.  Plaintiffs' Motion (Dkt. # 155) at 1.  Their amended motion (Dkt. # 157) asserts instead that the Court "reconsidered" its denial of the motion for expedited briefing, requesting a response by April 7, 2005.  Neither assertion is accurate.  The Court denied defendant's motion for expedited briefing (Order, Dkt. # 85) and took the motion for summary judgment under advisement, but did not extend the briefing schedule.  Taking a motion under advisement does not alter the briefing schedule or make the motion at issue.  Accordingly, the Court neither "recanted" nor "reconsidered" any previous order.  Although plaintiffs' response to the motion for summary judgment was due April 8, 2005 under the Local Rule, the Court asked plaintiffs' counsel at the pretrial conference if it could be filed on April 7, so that the Court would have the benefit of plaintiffs' written arguments at the April 11 hearing on the motion.  See Order of March 22, 2005 (Dkt. # 85); Transcript of Pretrial Conference, April 1, 2005, p.5, ll. 10-25; p. 60,

ll. 8-11, p.64, ll. 7-15.  At the time of the Court's request, Mr. Gellhorn (counsel for plaintiffs)

answered: "We'll do it, Your Honor. . . . Certainly."  Id. at 60, ll. 12, 14.

Plaintiffs filed their response to the motion for summary judgment, on April 7, 2005, only

one day before the deadline otherwise imposed by Local Rule.   On April 8, 2005, during a

telephonic hearing to discuss the summary judgment motion and the trial on the merits, the Court

outlined the approach to be taken:

> THE COURT: What I am trying to do is come up with a - - somewhat of a hybrid
> proceeding here on Monday mainly because of the time exigencies that are caused
> by the operation of the statute.  Because I was advised that I need to rule, I think, by
> the end of April.  So because we have these three days set aside, and I assume that
> the attorneys have cleared the decks and that the experts have cleared the decks,
> while you continue to work on your reply to summary judgment, I could have you
> make the record with the experts.  And if we rule on summary judgment that there
> is a question of fact, both sides will have an opportunity and we'll have to make time
> to take evidence regarding any genuine issues of material fact that we determine on
> summary judgment.  And both sides would have an opportunity - - well, first, the
> defendant] would have an opportunity to file their reply brief after the hearing, then
> we would rule on summary judgment.  And if we rule in defendant's favor, we'll
> await our notice of appeal.  If we rule that there is a genuine issue of material fact or
> two for trial, we'll give both sides an opportunity to tell us what witnesses are
> necessary and what dates are available for presentation of that evidence, and then
> we'll have findings and conclusions.  Does that work?
> MR. GELLHORN (counsel for plaintiffs): Well, on behalf of the plaintiffs, it seems
> to me that that's a reasonable schedule that we can work with and proceed forward.
> THE COURT: Does that work for you, Mr. Wilson?
> MR. WILSON (counsel for defendant): Your Honor, I think that does work.

Transcript of Proceedings, April 8, 2005, p. 10, ll. 4-25, p.11, ll. 1-5.  When the case was called for

trial on the merits on April 11, 2005, the Court began by explaining how defendant's motion for

summary judgment would be treated in relation to the trial on the merits:

> THE COURT: So as part of opening statements today, if you wish, I will consider
> any arguments you want to make with regard to the motion for summary judgment,
> including antitrust standing, your views on whether I got it right or wrong on per se
> violation, preemption and state action immunity, then any other comments that you
> want to make about the merits in your opening statements.  And then after that, we

12

> will proceed to presentation of the evidence. In considering the motion for summary judgment, I will not consider this record unless both parties stipulate that I do. In other words, I will grant or deny summary judgment based upon the pleadings. If summary judgment is granted, I will enter judgment. If it's denied, I will then consider this record and give both sides an opportunity to present any other witnesses they wish to present that we didn't get to in these three days or who weren't available during these three days. All right? Is that clear? Mr Gellhorn, did you have a problem with that?
>
> MR. GELLHORN (counsel for plaintiffs): No.

Transcript of Non-Jury Trial Proceedings, Vol. I, April 11, 2006, p. 6, ll. 6-23. The parties argued the summary judgment motion before the Court on April 11, 2005, then proceeded to the presentation of evidence on the merits. After three days of testimony, plaintiffs rested their case in chief.

Defendant filed a reply to the motion for summary judgment on April 19, 2005. Plaintiffs were permitted to file a surreply on April 27, 2005. Defendant filed a surresponse on May 17, 2005. On May 20, 2005, the Court granted summary judgment (Dkt. # 152) in favor of defendant as to plaintiffs' Sherman Act claims.

Contrary to their assertion that they were "railroaded" in the summary judgment briefing process, plaintiffs were given all but one of the 18 days allowed pursuant to Local Rule, as well as an opportunity to file a surreply. Further, Fed. R. Civ. P. 56 (f) protects parties from being "railroaded" by summary judgment motions, by providing that briefing may be stayed "to permit affidavits to be obtained or depositions to be taken or discovery to be had . . . as is just." A party seeking a delay for the purposes of conducting further discover should file an affidavit setting forth the reasons it is unable to present facts essential to the opposition of the summary judgment motion. Pasternak v. Lear Petroleum Exploration, Inc., 790 F.2d 828, 832 (10th Cir. 1986).

> Although the affidavit need not contain evidentiary facts, it must explain why facts precluding summary judgment cannot be presented. This includes identifying the

13

> probable facts not available and what steps have been taken to obtain these facts. In this circuit, the nonmovant also must explain how additional time will enable him to rebut movant's allegations of no genuine issue of fact.

Committee for the First Amendment, 962 F.2d at 1522. Not only did plaintiffs here fail to file such an affidavit, but they also failed even to ask for a stay in briefing to permit them to complete necessary discovery.

Prior to their Rule 59 (e) motion, although they did suggest that they be permitted to combine the summary judgment motion with the trial, as "a more efficient use of resources," by incorporating their response to the authorities cited in the motion into post-trial proposed findings of fact and conclusions of law (See Plaintiffs' Suggestion (Dkt. # 90) at 1), they did not complain that they lacked sufficient discovery to respond to the motion. To the contrary, they adhered to the original discovery cut-off as extended by agreement, they never submitted any affidavit such as that prescribed by the Tenth Circuit in Committee for the First Amendment, and despite their assertion that they "would never have agreed to a track that would have required them simultaneously to respond to a complex summary judgment motion while preparing for trial," they proceeded to trial without requesting a continuance.

Even though extended briefing on the summary judgment motion continued after trial, plaintiffs remained silent as to any discovery problems which might have precluded their successful completion of that process. Now, after the Court has entered its Order in favor of defendants, plaintiffs have come forward with their complaint concerning outstanding discovery disputes and lacking evidence. The Court finds that plaintiffs failed to comply with the prerequisites for

reconsideration in light of newly discovered evidence set out by Tenth Circuit jurisprudence.[8]  The motion should be and is hereby denied as to this ground.

**V.**

**IT IS THEREFORE ORDERED** that plaintiffs' motions to reconsider (Dkt. ## 155, 157) are **denied**.

**Dated** this 31st day of August, 2005.

_Claire V Eag_

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[8]   The Court further observes that the propositions in support of which plaintiffs' purport to present their supplemental evidence (see Plaintiffs' Amended Motion (Dkt. # 157) at 2 n.1) are generally irrelevant to the appropriate analysis in this case.  Whether NPMs have experienced a dramatic loss of sales and market share because of the Allocable Share Amendment is not relevant to the issue of whether its enactment constitutes a hybrid restraint.  Whether SPMs use the average cost advantage possibly created by their grandfathered shares is irrelevant to the issue of whether they are compelled by the structure of the MSA to keep their market shares steady or below their 1998 levels.  Whether the Allocable Share Amendment was drafted in part or in full by OPMs or any other tobacco lobbyists is irrelevant to the issue of whether it constitutes unilateral state action.  Whether defendant's argument concerning limiting youth smoking is incorrect is irrelevant to the issue of whether the enactment of the amendment constitutes unilateral state action.  So, even if the Court were to consider this evidence, it would not affect the analysis or otherwise raise any genuine issue of material fact for trial.